# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANTHONY J. KORZENIEWSKI,

      **Plaintiff,**

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

      **Defendant.**

**No. 12 C 6895**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff, Anthony J. Korzeniewski, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Commissioner's denial of his application for disability insurance benefits. For the reasons set forth below, the Court remands this case for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

On January 23, 2009, Mr. Korzeniewski filed an application for disability insurance benefits (DIB) and supplement social security income (SSI), in which he alleged a disability onset date of November 28, 2008.[2] The Social Security Administration denied his claims for both DIB and SSI on May 4, 2009, and then again

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

[2] On April 11, 2014, Plaintiff filed an Amended Complaint limiting the present claim from the onset of November 28, 2008, through February 9, 2011, at which point a subsequent claim for benefits was awarded. (Dkt. 33 at ¶ 8).

upon reconsideration on September 30, 2009.[3] (R. 80-3; 95-7). Mr. Korzeniewski filed a written request for a hearing, and on January 18, 2011, an Administrative Law Judge (ALJ) conducted a hearing. (R. 38-70). At that hearing, Mr. Korzeniewski testified, as did an impartial vocational expert, Julie Bose. (*Id.*)

On February 9, 2011, the ALJ issued a written opinion, finding that Mr. Korzeniewski was not disabled. (R. 17-26). Mr. Korzeniewski requested Appeals Council review, but the request was denied, rendering the ALJ's decision final. (R. 6). Korzeniewski then requested judicial review, for which this Court has jurisdiction pursuant to 42 U.S.C. § 405(g). Pursuant to the consent of the parties and 28 U.S.C. § 636(c), the case was reassigned to Magistrate Judge Rowland on December 12, 2012 for all further proceedings, including entry of final judgment. (Dkt. 11).

## II. SUMMARY OF ADMINISTRATIVE RECORD

Mr. Korzeniewski testified to being a 55-year-old man who completed the eleventh grade. (R. 42). At the time of his testimony, he was no longer working, but had worked maintenance in a building for about $200 per month since becoming disabled in November 2008. (R. 42–43). He testified that the main reason he cannot work is his bipolar disorder, his ADHD, and his anxiety. He is unable to focus, is very irritable and angry, has mood swings, and forgets things. (R. 44). He "can't talk socially with somebody without getting angry." (R. 45). He said he takes medications that have numerous side effects and testified to headaches specifically. (*Id.*).

---

[3] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.*

He hears voices that would make him "stop doing things. . . . I don't know if it's my brother calling me because my brother passed away a couple of years ago." (R. 46). The ALJ asked Mr. Korzeniewski if the voices were distracting to which he responded "well, the only time they are bothersome is . . . if I get the bad ones, you know, bad voices . . . like someone's coming for me or something like that." (R. 47). He admitted he had not heard the "bad voices" for a year, "somewhere in there." (R. 48).

He provides full time care to his disabled girlfriend. (*Id.*). He can drive, although he gets frustrated. (R. 49). He exercises and takes care of his girlfriend's two cats. (R. 52). He does the laundry, grocery shops, cleans the house, and visits his grandchildren. (R. 52-53). He not only takes care of his girlfriend's place, he takes care of his own place. (R. 53). When he watches football, he knows which team is winning, although he can "lose concentration a lot." (R. 57). He had just started taking Ritalin a few months prior to the hearing and thought it was helping "a little bit . . . but [he] still forget[s]." (R. 59–60). His ADHD was "a big issue" when he was working because "people do not understand ADHD." He testified that he would forget things and that would result in arguments with his boss. (R. 60). In response to the ALJ's questions, he testified that when he visits a doctor he can sign his name at check-in and answer the questions asked by the doctor. (R. 61). He said that he can sit for only a half hour to 45 minutes because he likes to be busy, describing himself as hyperactive. (R. 62).

He testified to having back pain, but said he can walk and stand. (R. 63). He can lift 50–70 pounds. He attends counseling one time a month. He called the suicide hotline in 2009, around when his brother died, and once attempted suicide by attaching a hose to the exhaust pipe of his car. (R. 50–52).

## A. Medical records

Beginning in Spring 2007 through March 2008, the medical records indicate that Mr. Korzeniewski treated regularly at Hines Veterans' Administration Hospital (Hines) for depression and ADHD. He reported anxiety, being overwhelmed by grief (his brother, a fellow veteran, had died recently), an inability to sit still, suicidal ideation, depression, fatigue, poor impulse control, and difficulty remembering things. (R. 344–46, 354, 361, 370–74). His Global Assessment Functioning (GAF) score remained consistent at 55 throughout that entire period. (R. 348, 356, 363). He was prescribed fluoxetine. (R. 326). He had previous trials of paroxetine, mirtazapine, venlafaxine, buspirone, and had tried bupropion. (R. 330). However, according to the notes, he could not tolerate those other medications.

Beginning in 2009 through February 2010, he treated with Dr. Mary Collins, a psychiatrist, and Mandi Evanson, a Licensed Clinical Social Worker. During that year, Mr. Korzeniewski received in-person treatment from Dr. Collins, on average one time per month, on the following dates: January 23, March 6, April 17, May 1, May 15, June 1, June 15, July 27, August 28, September 25, October 30, and December 4, 2009, and January 25 and February 26, 2010. (R. 556, 560, 566, 576, 582, 600, 608, 619, 632, 643, 646, 764, 771). After each session with Dr. Collins, Mr. Kor-

zemiewski then had a counseling session with Ms. Evanson which lasted between 50 to 75 minutes. (R. 551, 559, 568, 574, 585, 590, 603, 610, 622, 628, 636, 639, 763, 769). Dr. Collins reviewed each of Ms. Evanson's notes from her sessions with Mr. Korzeniewski. In addition to monthly treatment, Dr. Collins had regular contact with Mr. Korzeniewski in between appointments. The telephonic meetings included discussions about Mr. Korzeniewski hearing voices, his inability to cope with his daily stressors and the effectiveness of his medication.[4] Like Dr. Collins, Ms. Evanson spoke to Mr. Korzeniewski on numerous occasions between appointments about his status.[5] All of Ms. Evanson's notes about these discussions were reviewed by Dr. Collins.

In March 2009, Dr. Collins assessed Mr. Korzeniewski to be a moderate suicide risk. (R. 327). During his March appointment, he reported that he just lost his job and was unable to return to work because he needed to care for his girlfriend. (*Id.*) On April 1, 2009, he reported daily suicidal ideation, mood swings, and increased anxiety. (R. 324). He also reported that he called the suicide hotline, and Dr. Collins assessed him as a High Risk for suicide. (R. 636–38).

---

[4] Dr. Collins spoke to her patient on the following dates: February 23, April 1, 9, and 27, May 11 and 21, June 15, 19, and 25, July 7, 13, and 24, August 14, 21, and 24, September 14, and December 11, 2009, and January 1 and 11, 2010. (R. 543, 573, 577, 580, 586, 588–89, 592, 595, 597, 605, 618, 624, 637, 643, 645, 773–74).

[5] Mr. Korzeniewski spoke with Ms. Evanson on April 1, 23, 26, and 27, May 12, 21, and 28, June 11 and 19, July 22, August 11 and 20, September 16, October 14 and 26, November 19, and December 18, 23, 30, and 31, 2009, and February 20, 2010. (R. 559, 568, 572, 579, 581, 587, 595, 598, 604–05, 617, 623, 625–26, 635, 769, 775-77).

On April 27, 2009, Tyrone Hollerauer, a nonexamining doctor of psychology, having reviewed the Hines medical records dated between April 24, 2007 and April 10, 2009, performed a Psychiatric Review Technique and found only mild limitations in: (1) activities of daily living, (2) maintaining social functioning and (3) maintaining concentration, persistence, or pace. (R. 454–56). He found no episodes of decompensations. (R. 454).

When Mr. Korzeniewski spoke to Ms. Evanson on April 26, 2009, he was "talking fast" and was very overwhelmed. (R. 502). Later on April 26, 2009, he called the suicide hotline and stated he could not "take it anymore." (R. 536). He reported to the hotline that he was depressed, has ADHD, and was hearing voices. (*Id.*) The next day, on April 27, 2009, he left a message Ms. Evanson saying that he was having more frequent anxiety attacks and more auditory hallucinations. (R. 501). On May 1, 2009, he reported that the auditory hallucinations were less intense and less loud, but suicide was always in the back of his mind. (R. 498). The rest of the month of May, Mr. Korzeniewski's symptoms remained largely unchanged. (R. 486, 489, 604, 608–10, 619–20). In June, he could not sleep and continued to hear voices; however, his risk of committing suicide was reassessed from being high to being a moderate to low risk. (R. 478, 591). Throughout that summer he continued to hear voices, reported an inability to concentrate, was consistently overwhelmed, and had trouble with focus. (R. 471, 474–76, 581). One night in July, he was so agitated he drank almost a fifth of vodka and passed out at a hotel. In August, the police were

called to his apartment because of an argument he had with his girlfriend's mother. (R. 476, 579, 582).

On September 28, 2009, Dr. Terry Travis, a nonexamining Disability Determination Services doctor, affirmed the finding of Dr. Hollerauer. (R. 512–14). In affirming, Dr. Travis issued a revision which briefly summarized the Hines' records from March through August 2009. (R. 514). None of those records changed Dr. Travis's view of the outcome. (*Id.*).

Between September and November of 2009, Mr. Korzeniewski's condition did not improve. He continued to be overwhelmed, irritable, and unable to concentrate. (R. 559, 561-62, 566). His suicidal ideation and auditory hallucinations continued unabated. (*Id.*)

On November 27, 2009, Mr. Korzeniewski reported that he attempted suicide by hooking a vacuum cleaner hose up to the car exhaust. (R. 547). When a neighbor asked him what he was doing, he abandoned his suicide attempt. (*Id.*) When he met with Ms. Evanson on December 4, 2009, he had a facial tick and bleeding gums both of which he was unaware. (R. 551). She placed him back on the High Risk for Suicide list. (R. 544).

On December 11, 2009, when Dr. Collins called Mr. Korzeniewski to check on him, he reported that he was doing well, looking forward to the holidays, and had no suicidal ideation. (R. 543). Furthermore, on December 18, 23, and 31, Mr. Korzeniewski reported that he was less irritable and less depressed. (R. 775–77). Although he reported ongoing distress and auditory hallucinations at his January 25,

2010 appointment, the notes from his February appointment indicate improvement with medication. (R. 763–64, 771).

On January 29, 2010, Dr. Collins completed a Mental Impairment Questionnaire. (R. 655). She diagnosed Mr. Korzeniewski with depression, ADHD and bipolar disorder. (*Id.*). Dr. Collins noted a GAF score of 50 (erroneously noting the highest GAF score for the past year was 50).[6] (*Id.*). She opined that his prognosis was poor, he was easily agitated and would miss more than three days of work per month. (R. 656). She also noted that he was "very sensitive to medication [with] side effects." (*Id.*). She further opined that he would be unable to (1) understand or remember short and simple instructions; (2) maintain attention for a two hour segment; or (3) deal with normal work stress. (R. 657). While she found only moderate restriction in daily living activities, she found marked difficulties in social functioning and constant deficiencies in concentration, persistence, or pace. (R. 658).

In March, Dr. Collins removed Mr. Korzeniewski's name from the High Risk for Suicide List and transferred his care to Crown Point Indiana which was closer to his home. (R. 761). Upon his transfer to Crown Point, Mr. Korzeniewski began treating with Dr. Fadel Shaaban. Dr. Shaaban diagnosed Mr. Korzeniewski with schizoaffective disorder and ADHD. On May 10, 2010, Dr. Shaaban stated: "Mr. Korzeniewski has a long history of schizoaffective disorder and ADHD. He is doing better on current dose of medications. I will continue to adjust his meds." (R. 716). In June, Mr.

---

[6] All of the mental status evaluations performed upon Mr. Korzeniewski by Hines between March 2009 and February 2010 assessed his GAF score at 55. (R. 329, 474, 485, 498, 507, 557, 562, 577, 583, 601, 608, 620, 766, 773).

Korzeniewski reported that he was restless and hyperactive and was having diffi-
culty concentrating and was becoming angry easily. (R. 710). In August, he still re-
ported being quite irritable, but had some improvement in his focus and concentra-
tion. (R. 706). He was still having auditory hallucinations, and while he was without
suicidal ideation, he did have paranoid ideas. (*Id.*). In October, his auditory halluci-
nations were less frequent and his focus was better, but he still had difficulty con-
centrating and angered easily. (R. 705). In November 2010, the last month for which
there are records in the file, Mr. Korzeniewski showed some improvement where he
was less angry and irritable and able to focus more in the morning, although con-
centration in the afternoon still posed quite a problem. (R. 699). Auditory hallucina-
tions were both less frequent and less disturbing. (*Id.*). The Crown Point team as-
sessed Mr. Korzeniewski's GAF score on three separate occasions, all three times
lower than what it was the year before at Hines. In April, his GAF was assessed at
44; in July and October, it was assessed at 52. (R. 706, 709, 729).

## B. The ALJ's findings

The ALJ determined that Mr. Korzeniewski met the insured status require-
ments through December 31, 2013, and that he has not engaged in substantial gain-
ful activity since the alleged onset date of November 28, 2008. (R. 19). The ALJ also
found the following severe impairments: depression, anxiety, and attention defi-
cit/hyperactivity disorder (ADHD). (*Id.*). The ALJ, while noting that Mr. Korzeniew-
ski had been prescribed a back stabilizer and Vicodin for back pain, determined that
any back pain he suffered placed no more than a minimal limitation on his physical

capabilities. (R. 19). She also determined that, although there was "notation of a schizoaffective disorder in the record, there is no indication that [it] is expected to continue for twelve months," so it failed to meet the durational requirement. (R. 20).

After determining that Mr. Korzeniewski's mental impairments, alone and in combination, did not meet or equal a listing, (R. 20), the ALJ determined Mr. Korzeniewski had the Residual Functional Capacity (RFC)[7] to perform work on all exertional levels with the nonexertional limitations that he have only occasional interactions with co-workers and the public and that he work only unskilled work with no production quotas. (R. 21). Based on the limitation regarding interactions with others, the ALJ found that Mr. Korzeniewski is unable to perform his past relevant work of cabinet maker. (R. 24–25). However, in light of his RFC and the testimony provided by a Vocational Expert, the ALJ determined that because there are jobs that exist in significant numbers in the national economy that Mr. Korzeniewski can perform, he is not disabled. (*Id.*).

### III. STANDARD OF REVIEW

The standard for review of an appeal from the Social Security Administration denying disability benefits is well established. To establish a "disability" under the Social Security Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be ex-

---

[7] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

pected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant must demonstrate that his impairments prevent him from performing not only past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

The regulations under the Social Security Act set forth a five-step process to determine whether a person is disabled. 20 C.F.R. § 404.1520(a)(4). Under these regulations, an ALJ must consider (1) whether the claimant presently has substantial, gainful employment; (2) whether the claimant's alleged impairment or combination of alleged impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) the specific impairments that are listed in the appendix to the regulations as severe enough to preclude gainful employment; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4), (b)–(f); *see also Young v. Sec'y of Health and Human Serv.*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. *See* 20 C.F.R. § 404.1520(a)(4). A negative answer at any step other than Step 3 precludes a finding that the claimant is disabled. *Young,* 957 F.2d at 388. The claimant bears the burden of proof at Steps 1–4. As part of Step 3 (whether claimant's impairments are severe enough to preclude gainful employment), the ALJ's analysis typically involves an evaluation of the claimant's RFC. *See* 20 C.F.R. § 404.1520(e).

This RFC is also used for purposes of Step 4 to determine whether the claimant may work in his or her previous occupations. *Id.*

At Step 5, the burden shifts to the Commissioner, who must "provid[e] evidence showing that other work exists in significant numbers in the national economy that [the claimant] can do, given [his] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). If a claimant's RFC allows him to perform jobs that exist in significant numbers in the national economy, then the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1).

In reviewing the ALJ's decision, courts may not decide facts anew, reweigh evidence, or substitute their judgment for the articulated judgment of the ALJ. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The reviewing court will uphold the Commissioner's decision if it is supported by "substantial evidence," and is free of legal error. 42 U.S.C. § 405(g) (2004); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. R.R. Retirement Bd.,* 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If conflicting evidence would allow reasonable minds to differ, the responsibility to determine disability belongs to the Commissioner (and the ALJ, by extension), not the courts. *See Heir v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to evidence that the ALJ finds more credible).

However, an ALJ is not entitled to unlimited judicial deference. An ALJ must "build an accurate and logical bridge from the evidence to [his or] her conclusion," *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001), and "must confront the evidence that does not support his [or her] conclusion and explain why it was rejected." *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004). The ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *See Herron,* 19 F.3d at 334. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ must state the reasons he or she accepted or rejected "entire lines of evidence." *Id.* at 333; *see also Young,* 957 F.2d at 393 (in order for there to be a meaningful appellate review, the ALJ must articulate a reason for rejecting evidence "within reasonable limits"). The written decision must include specific reasons that explain the ALJ's decision, so that the reviewing court can ultimately assess whether the determination was supported by substantial evidence or was "patently wrong." *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000)).

## IV. DISCUSSION

Mr. Korzeniewski raises three arguments in support of his request for reversal and remand of the agency's decision: (A) the ALJ failed to give proper weight to Mr.

Korzeniewski's treating physician; (B) the ALJ made an improper credibility determination; and (C) the ALJ's Step Five finding is erroneous.[8] (Mot at 8).

"[I]n determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003). In fact, the opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); accord *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir. 2008). That is because a treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater,* 91 F.3d 972, 979 (7th Cir. 1996); Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) ("More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances."). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)) (other citation omitted), and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice," *Gudgel*, 345 F.3d at 470. In sum, an ALJ "can reject an examining physician's opinion only for reasons supported by substantial evidence in the rec-

---

[8] Because the Court is remanding the ALJ's decision to give the treating physician's opinion little weight, the Court will not consider the Plaintiff's arguments regarding the ALJ's credibility determination or the Step Five finding.

ord." *Campbell*, 627 F.3d at 306. Furthermore, it is well-established that "[i]f an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *see* 20 C.F.R. §§ 404.1527(c)(3)–(6), 416.927(c)(3)–(6).

The ALJ summarized the findings contained in the Mental Impairment Questionnaire completed by Dr. Collins and then found:

> Dr. Collin's [sic] opinion is given little weight. Dr. Collins evaluated the claimant shortly after his attempted suicide and thus her opinion was colored by the claimant's subjective complaints. Additionally, the medical evidence of record indicates that the claimant's condition improved significantly several month [sic] later following treatment and medication.

(R. 24).

The Court is troubled by this finding for several reasons. First, there is no basis in the record for the ALJ to find that Dr. Collins's opinion was "colored by the claimant's subjective complaints" because she completed the questionnaire shortly after his suicide attempt. All diagnoses, particularly those involving mental health conditions, require consideration of the claimant's subjective symptoms. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012) ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."); *Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *19

(N.D. Ill. March 21, 2012) (in a case involving disability claim based on mental health disability, the "ALJ fails to point to anything that suggests that the weight [the claimant's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable."); *Ryan v. Comm'r*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) (where disability asserted is one of mental health, "an ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations."). Mr. Korzeniewski's statements were necessarily and appropriately factored into Dr. Collins's analysis.

In support of the ALJ's reasoning, the Commissioner cites cases where courts have affirmed an ALJ's decision not to credit a treating physician's opinion that was based solely on the patient's subjective complaints. (Resp. at 5–6). However, those cases are not persuasive because they involve non-mental health conditions that are able to be objectively verified through medical tests and lab results. *See Rice v. Barnhart,* 384 F.3d 363, 370-71 (7th Cir. 2004) (where claimant complained of back pain and ALJ discussed "in detail . . . the objective evidence of disc degeneration and disc herniation from 1995 to 1998" and the treating physician's "clinical findings were negative," the ALJ did not err in disregarding limitations contained in treating physician's "oblique" note that "were presumably based upon [plaintiff's] subjective complaints."); *Dixon,* 270 F.3d at 1177 (affirming ALJ's decision to discount treating physician's opinion of severe arthritis and blurry vision where X-rays

failed to show any degenerative changes, orthopedic specialist found good range of motion and ophthalmology exam failed to show any significant abnormalities); *Johansen v. Barnhart,* 314 F.3d 283, 287-88 (7th Cir. 2002) (affirming ALJ where one treating physician's opinion "is contradicted by the earlier opinions of two treating physicians . . . as well as that of consultative physician").

Second, in making this finding, the ALJ did not consider the factors required by the regulations. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). Generally, the Commissioner gives more weight to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider a checklist of factors—"the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527. Here, the factors weigh heavily in favor of giving Dr. Collins's

opinion controlling weight: Dr. Collins had a consistent and involved treatment relationship with Mr. Korzeniewski with whom she conducted monthly counseling sessions. A Licensed Clinical Social Worker conducted separate monthly counseling sessions under her supervision. He was repeatedly assessed and reassessed for suicide risk. In between sessions, he would call for support or medication adjustments and, on occasions, Dr. Collins and her staff would call him to check his status. Furthermore, Dr. Collins is a psychiatrist with a specialty in treating veterans. This strikes the court as too strong a treating relationship to be disregard by the ALJ in a single sentence. "Proper consideration of these factors may have caused the ALJ to accord greater weight to [Dr. Collins's] opinion." *Campbell*, 627 F.3d at 308.

The Commissioner responds that the ALJ was required to consider the six regulatory factors but "there is a notable distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." (Resp. 6) (citing SSR 06-03p, 2006 WL 2329929, at *6 (Aug. 9, 2006)). The Commissioner then cites cases affirming ALJ decisions where, although the factors are not discussed, the decisions show that the factors were considered. *See McCormick v. Astrue*, No. 11 C 0328, 2012 WL 1886508, at *12–13 (N.D. Ind. May 23, 2012) (where the ALJ gave the doctor's overall opinion "significant weight" but did not accept the limitation that the claimant stand for only four hours per day, the Court found that the ALJ properly applied regulatory factors because ALJ implicitly addressed length of treatment relationship and the number of examinations, which was singular in this case); *McCullough v. Apfel*, No. 00-1888, 234 F.3d 1273, at *4

(7th Cir. Nov. 2, 2000) (where treating physician had essentially shown bias in a letter he had submitted to the ALJ, the Court affirmed the denial of benefits and found that "although the ALJ did not specifically outline his findings on each of the[ regulatory] factors" he properly considered them when he noted length of treating relationship and consistency of treating physician's opinion) (unpublished opinion); *Sullivan v. Astrue*, 825 F. Supp. 2d 928, 940 (N.D. Ill. 2011) (concluding that ALJ's failure to explicitly mention regulatory factors was harmless because ALJ properly found that the medical records directly contradicted treating physician's opinion); *Elder v. Astrue*, 529 F.3d 408, 414–16 (7th Cir. 2008) (finding that ALJ properly discounted treating physician's opinion because he was not a specialist and failed to conduct a thorough examination to substantiate his opinion). The Commissioner correctly cites these cases for the proposition that the regulatory factors can be impliedly considered. However, they are not persuasive here. The ALJ gave no indication that she took into account Dr. Collins's specialty or treatment history with Mr. Korzeniewski. To the contrary, had the ALJ properly considered Dr. Collins's expertise as a psychiatrist working with veterans, she may not have so quickly dismissed her medical opinion as one "colored by" Mr. Korzeniewski's recent suicide attempt.

Finally, there is no basis to conclude that Dr. Collins's opinion was not based on her professional observations during the entirety of her treatment of Mr. Korzeniewski as opposed to being "colored by [Plaintiff's] subjective complaints." As described above, Mr. Korzeniewski received in-person treatment with Dr. Collins and Ms. Evanson on at least a monthly basis from January 2009 through February

2010. In addition, both Dr. Collins and Ms. Evanson had regular telephone contact with Mr. Korzeniewski in between appointments. There is nothing in the record to support the conclusion that Dr. Collins's professional opinion was swayed by Mr. Korzeniewski's attempted suicide in late November. Courts have recognized that mental health impairments are often misunderstood. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("But by cherry-picking [the treating physician's] file to locate a single treatment note that purportedly undermines her overall assessment of [the claimant's] functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness."); *Kangail v. Barnhart*, 454 F.3d 627, 629–30 (7th Cir. 2006) (mental illnesses are often episodic); *Phillips v. Astrue*, 413 F. App'x 878, 886 (7th Cir. 2010) ("The ALJ's assessment of the medical record also demonstrates a misunderstanding about the nature of mental illness. . . . Many mental illnesses are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms."); *Larson*, 615 F.3d at 751 ("More importantly, symptoms that 'wax and wane' are not inconsistent with a diagnosis of recurrent, major depression."); *Bauer,* 532 F.3d at 609 ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days."); *see also Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010) (collecting cases). Nor is there any medical evidence to support the ALJ's conjecture that Mr. Korzeniewski's symptoms are correlated with his role as his disabled girlfriend's caretaker such that his functional capacity would be significantly improved

if he did not have to care for her. "An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); see *Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996) ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

What is most troubling is that the ALJ discounts Dr. Collins's opinion because "the medical evidence of record indicates that the claimant's condition improved significantly several months later." (R. 24). In fact, the treatment records for the ten months following Dr. Collins's report, February 2010 through November 2010, read much the same as the medical records prior to Dr. Collins's report. When he transferred his treatment to the Veteran's Hospital in Crown Point, Indiana, he was diagnosed with schizoaffective disorder. In June 2010, Mr. Korzeniewski reported that he was restless and hyperactive and was having difficulty concentrating and became angry easily. (R. 710). In August, he reported being quite irritable, having auditory hallucinations, and having paranoid ideas. (R. 706). In October, his auditory hallucinations were less frequent and his focus was better, but he still had difficulty concentrating and angered easily. (R. 705). In November 2010, Mr. Korzeniewski's morning concentration was better, but concentration in the afternoon still posed quite a problem. (R. 699). However, auditory hallucinations were less frequent and less disturbing. (*Id.*). Notably, Mr. Korzeniewski's GAF score in April of 2010 was assessed at 44, in July and October it was assessed at 52. (R. 706, 709,

729). All three of these GAF scores are lower than the GAF of 55 that Mr. Korzeniewski consistently received prior to Dr. Collins's report.[9] *Bates v. Colvin,* 736 F.3d 1093, 1099 n.3 (7th Cir. 2013) ("The GAF score reflects both severity of symptoms and functional level. . . . We recognize that a low GAF score alone is insufficient to overturn an ALJ's finding of no disability. In this case, however, taking the GAF scores in context helps reveal the ALJ's insufficient consideration of all the evidence Bates presented.") (citations omitted). The key point is that the GAF scores remained generally consistent, before and after Dr. Collins's assessment.

This Court is not certain if Mr. Korzeniewski's condition improved in the months following Dr. Collins's report or not. But there is no medical testimony supporting that conclusion. The first opinion provided by the Department of Disability Determinations was completed on April 27, 2009, before the bulk of the medical records in the case were created and a full eight months before Dr. Collins rendered her opinion. Likewise, the second DDS opinion on September 28, 2009, was rendered prior to Mr. Korzeniewski's attempted suicide and a full year before the medical records in the case close. Significantly, the ALJ did not entirely credit the DDS medical opinions either, according each of them only "some weight." (R. 23). *Rohan*, 98 F.3d at 968 ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."); *Clifford*, 227 F.3d at 870 ("An ALJ must not substitute his own judg-

---

[9] A GAF score of 41–50 indicates *serious* symptoms or *serious* impairment in social or occupational functioning; GAF score of 51-60 indicates *moderate* symptoms or *moderate* difficulty in social or occupational functioning. *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Rev. 2000).

ment for a physician's opinion without relying on other medical evidence or authority in the record.").

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Collins's opinion. If the ALJ has any questions about whether to give controlling weight to Dr. Collins's opinion, she is encouraged to recontact her, order a consultative examination, or seek the assistance of a medical expert. *See* SSR 96-5p, at *2; 20 C.F.R. §§ 404.1517, 416.917, 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("If the ALJ thought he needed to know the basis of medical opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.") (citation omitted). If the ALJ finds "good reasons" for not giving Dr. Collins's opinion controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Collins's opinion.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [14] is **GRANTED**, and Defendant's Motion for Summary Judgment [22] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: April 14, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge